

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 17 2019 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

Russell Allen,

      Petitioner,

v.

UNITED STATES OF AMERICA,

      Respondent.

---

Motion Pursuant to Fed.Civ.R.P. 60(b)(6)
Request for Relief

---

Russell Allen, Pro Se
Reg No. 74365-053
Florence FCI
PO Box 6000
Florence, CO 81226



## RULE 60 (b)(6)/SECOND SUCCESSIVE

Request for relief pursuant to Fed.R.Civ.P. 60(b)(6). Comes now, Petitioner Russell Allen, pro se, moves this honorable court pursuant to Fed.R. Civ.P. 60(b)(6) for relief from judgment entered.

Pro se litigants submissions are construed liberally "to raise the strongest arguments that they suggest." <u>Diaz v. United States</u>, 517 F.3d 608, 613 (2nd Cir. 2008) (citation omitted.)

## RULE 60(b)(6)

The purpose of Rule 60(b) is to strike a balance "between serving the ends of justice and preserve the finality of judgments." <u>Harris v. City of New York</u>, 2012 US Dist Lexis 161402 (S.D.NY.) (quoting <u>Nemaizer v. Baker</u>, 793 F.3d 58 (2nd Cir. 1986). Rule 60(b), however, is available only upon a showing of exceptional circumstances because it allows "extraordinary judicial relief." <u>Nemaizer</u>, 793 F.2d at 61. Allen's (fn. 1) compelling claims herein as explained infra, will lend definitively to what is defined as exceptional circumstances. Moreover, relief pursuant to Rule 60(b)(6) though no specific limitations must be made within reasonable time. Court(s) have recognized "reasonable time" as 18 months unless the movant show good cause for the delay or mitigating circumstances. <u>Rowe Entmt.v. William Morris Agency Inc.</u>,2012 US Dist Lexis 1611313 at *2 (S.D.N.Y.) (2012) (citation omitted). The cause, undue hardship, prejudice as will be outlined represents something more, ie: unusual and extreme situation where principles of equity mandate relief.

## CAUSE AND PREJUDICE

Under the cause and prejudice "test" cause is defined as "some objective factor external to the defense that impeded the defendant's efforts to raise his claim(s). <u>McCleskey v. Zant</u>, 499 US 467, 493 (1991) (quoting <u>Murray v. Carrier</u>, 477 US 478-88 (1986). To demonstrate prejudice, a petitioner must show more than errors "created a possibility of prejudice, but [instead] that they

fn. 1 - Petitioner is referred to as Allen.

-1-

worked to 'his actual and substantial disadvantage." U.S. v. Frady, 456 US 152,
170. Cause can be found undue hardship in Allen's plight post conviction. Un-
due hardship in the forum of defamation of character. See Allen v. Don Diva,
2016 US Dist. Lexis 98762, see also Allen v. Don Diva Mag. Ent., 2015 US Dist.
Lexis 167023 (E.D.N.Y. Dec. 10, 2015) Here, external factors, ie: Don Diva ma-
gazines, would go onto defame Allen and place a stigma on him, creating undue
hardship by its false publication and establish cause. Cause and undue hard-
ship can be found in Allen protecting and defending his name sake in the ri-
gorous challenges of prison from unfounded allegations. To do so, when in peril,
litigation would seem a daunting task. Yet, Allen did exactly that diligently
despite extraordinary circumstance standing in his way. Pace v. DiGuglielmo ,
544 US 408, 418 (2005). Exhibits A-D attached demonstrate cause and prejudice:
administrative impediment (Ex. A), detailed written correspondence of situation
(Ex. B), Letters from Case Manager (Ex. C), and detention orders (Ex. D) are
duly noted. Rarely, jurist may envision the harshness of an environment, in
which defamation is not settled with lawsuits. To the contrary, they are settled
in a microcosm of a world (prison) with violence. This cannot parallel to civ-
il society. In a subsequent civil ruling, Allen v. Don Diva Mag. Ent., 2015
US Dist. Lexis 167023 (E.D.N.Y. Dec. 10, 2015), this would appeared to be stated.
Again, defending one's name sake figuratively, Allen v. Don Diva Mag. Ent., 2015
US Dist Lexis 167023 (E.D.N.Y. Dec. 10, 2015) and literally (prison) cannot
be understated. Through the hardships of segregation, limited access to legal
materials, not being able to litigate established cause and prejudice. Rule 60
(b)(6) may be used to grant relief in cases of extreme and undue hardship. United
States v. Karahlias, 205 F.2d 331-33 (CA 2) (1953).

EXTRAORDINARY CIRCUMSTANCES LEND TO ALLEN'S
UNREASONABLE DELAY

As stated supra, the cause constitutes extraordinary circumstances. Ap-

-2-

plicants burden to show that he pursued his claims diligently and extraordi-
nary circumstances stood in his way. Citing Holland v. Forida, 560 US 631,
649 (2010). As stated supra, prevented Allen from timely filing. Focusing on
Allen's reasons provides insight for delay. See PRC Harris, Inc. v. Boeing Co.,
700 F.2d 894, 897 (2d Cir. 1983) (In order to determine  "extreme hardships"
to determine whether a Rule 60(b) motion was filed in a reasonable time, the
court should ("scruntinize the particular circumstances of the case, and ba-
lance the interest in finality with the reason for delay.")) See also United
States v.  Cirami, 563 F.2d 26, 32 (2d Cir. 1977) (citation omitted). Factors
beyond Allen's control are presented herein, though time has elapsed, insight
can be found in Klapprott v. United States, 335 US 601 (1949). Four years af-
ter a default judgment was entered against him, he sought to reopen the matter
under Rule 60(b) and was permitted to do so. Allen seeks remedy to do so.

## COUNSEL EXCUSABLE NEGLECT

Attorney carelessness can constitute excusable neglect. Pioneer Invest-
ment v. Brunswick Associates, 1135 S.Ct. 1489 (1993). Mistake and inadvertence
in failing to object to rulings constituted "excusable neglect" at Allen's sen-
tencing hearing. Attorney offered [not] by way of excuse, neither by way of ex-
plaination for conduct harmful to Allen. See Pioneer, at 1489. "Excusable neg-
lect "can include omissions through carelessness and mistake." Harmful in not
preserving matters for appeal, diligence in correct sentencing calculus. Absent
this neglect, the proceeding would have been different. Strickland, Id. at 694.
See Murden v. Artuz, 497 f.3d 178, 198 (2d Cir. 2007). One cannot merely pre-
vail due to belief counsel's strategy was inadequate. United States v. Sanchez,
790 F.2d 245, 246, 253 (2d Cir. 1986), see Mason v. Scully, 16 F.3d 38, 42 (2d
Cir. 1994) ("Actions or omission by counsel that might be considered sound trial
strategy do not constitute ineffective assistance of counsel.") However, failure
to give advice as to how to deal with an offered plea bargain constitutes inef-

-3-

fective assistance of counsel. <u>Boria v. Keane</u>, 99 F.3d 492 (2d Cir. 1996) Dis-

charging of duties informing terms of plea offer <u>guidelines</u> the strength and

weakness of case against him and alternative sentences to which he would most

likely be exposed. <u>Purg v. United States</u>, 208 F.3d 41, 45 (2d Cir. 2000). At-

torney must exercise  due care when advising client. How best to advise a client

on one hand, failing to give advice there are a garden varieties of giving as-

sistance. Though no fault of his own, Allen was prejudiced. The court may grant

relief recognizing neglect from final judgment considering additional factors.

<u>United Coin Meter</u>, F.2d at 845. In <u>United Coin Meter</u>, factors were: (1) whether

plaintiff will be prejudice; (2) whether the defense has a meritorious defense;

(3) whether culpable conduct of defendant led to the default. Allen answers in

the apposite that: (1) plaintiff, ie :USA, would not be prejudiced; (2) as stated

herein, he has a meritorious defense; (3) his conduct is not culpable for the

default. <u>United Coin Meter</u>, 705 F.2d at 845.

2255/PROCEDURAL DEFAULT RESULTING IN MISCARRIAGE OF JUSTICE

Case law is clear that "a procedural default of even a constitutional is-

sue will bar review under 2255 unless the defendant can meet the cause and pre-

judice test." Allen claim clearly fit within the ambit of the cause and preju-

dice test. Allen's reliance upon counsel's assumption of correction in the sen-

tencing proceedings were paramount. Whereas here, direct appeal claims not rais-

ed are recognized as unpursuable in hebeas proceedings. Unless Allen can demon-

strate both cause and prejudice. Cause, as stated supra, for the default and

prejudice, respectively, arising from imposing the bar of a default or a fund-

amental miscarriage of justice. <u>Strogov v. Attorney Gen. of State N.Y.</u>, 191 F.3d

188 (2d Cir. 1999). A fundamental miscarriage of justice occurs when a petition-

er is factually innocent of a charge. Bousley v. United States, 118 S.Ct. 1604

(1998). Fundamental miscarriage has also been addressed when petitioner was not

actually innocent of the underlying offense. <u>Spence v. Superintendent Great</u>

-4-

Meadow Correc. Facility, 219 F.3d 162, 171-72 (2d Cir. 2000). Where the court
held that "actual innocent" can include not only innocence of the offense it-
self, but also at least some other instances where the purported existence of
an underlying fact resulted in an increased penalty. The same, as will be out-
lined infra, can be attested to Allen. As in Spence, sentencing facts require
Allen demonstrate his "innocence" of a sentencing condition by "clear and con-
vincing proof." 219 F.3d at 172. Thus infra, Allen will demonstrate innocence
pertaining to his sentencing condition.

GROUPING ENHANCEMENTS MISAPPLIED AFFECT ALLEN'S SENTENCING CONDITION

Per grouping provisions contained in USSG 3D1.1(a) and 3D1.4(a), which
provide for calculation of offense (combined) by taking the offense level ap-
plicable to the count(s) with the highest offense level and then adding levels
to account for the fact that multiple counts are involved. 3D1.4 as here, de-
termination of combine levels, the number of units correlating, with the un-
derline two acts: (1) murder and (2) conspiracy to commit murder. 2A1.1(a),
the base offense level is the serverest 43. The violation for 18 USC 1962(c)
found in USSG 2E1.1(a) and (2), which states the base offense level is 19 or
the applicable underlying racketeering activity, which ever is higher. Per
2E1.1(a)(2), was applied cross referenced and reached 43, respectively. The a-
nalogue is not of issue grouping to achieve the result for additional levels
is improper enhancement took place at the original sentencing. According to PSR
(see page ___, paragraph ___), the underlying acts had the highest offense le-
vel of 43. Per 3D1.4, two additional levels were applied. Citing United States
v. Stanley, 12 F.3d 17 (2d Cir. 1993) (Stanley I), cert. denied 511 US 1044
(1994). Remand, where the court failed, to make factual findings to support
lost calculation and thereby may have improperly increased the offense level.
Id. at 21. Allen's plight speaks to the latter. No factual finding rendered an
increased offense level. The parties viewed the PSR's finding's presumptively

-5-

correct. No objections were made by counsel, ie: Allen's agent, while the court did not indicate an intention to depart upwardly it sentenced Allen to 360 months. BAsed in part on an offense level with a two level adjustment. Assuming arguendo the base offense level not being 45 and then capped at 43 as authorized, this is the appropriate benchmark for sentencing. See Rivera, 976 F.Supp. 2d 152 (2d Cir. 2013) (Multiple groupings yet a maximum 43 was benchmark.) Grouping scheme could serve as harmless error. See United States v. Tropiano, 50 F.3d 157, 162 (2d Cir. 1995) ("We will vacate a sentence and remand for resentencing because of misapplication of the guidelines only if we determine the error was not harmless.") The ambiguity rests in the grouping scheme. Offense level 43 is higher comparably to 19 under 2E1.1, Racketeering. The PSR calculus was not correctly calculated, thus, lending credence to USSG 3D1.4(c). Chapter 3 of this Section 3D1.4(c) states:

> "Disregard any group that is 9 or more less serious than the group with the highest offense level. Such groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable level."

The statutory maximum guideline was 43, not 45, and as stated supra, the court made no mention of its intention to depart upward. See Garafola v. United States, 2d Cir. 2012 Lexis US Dist. Lexis 63, where at sentencing the court explained ("[b]ecause [the] [b]ase [o]ffense [l]evel for racketeering act two is more than nine levels higher than offense of racketeering act, the conspiracy to murder Salvatore Gravano racketeering act five conspiracy to commit extortion, the offense level is determine solely on racketeering act two, the murder.") (A base offense level of 43 is the initial beachmark.) (Initial) prior to adjustment, this illustration parallels Allen's situation. The guideline calculation is the starting point and the "initial benchmark." Gall v. United States, 552 US 38, 49 (2007). The base offense level 43, though maximum, is only an intermediate guideline calculation before other adjustments, such as, three

-6-

level downward adjustment for acceptance, USSG 3E1.1. In any event, any final guideline calculation would be limited by the adjusted statutory maximum penalty. See 5G1.1(a). After determination of final offense level, court determines total punishment. It is noted the highest offense level, pursuant to the sentencing table, is 43. Numerous 2nd Cir. Circuit RICO cases support this as stated supra. Allen adjustments are as follows: because Allen was a minor-minimal participant and no pecuniary gain was acquired, pursuant to Section 3B1.2(a); a 4-level adjustment was warranted and ironically, supported by the PSR. Further, adjustment under 3E1.1, acceptance a 3-level adjustment was applied. Had they started at 43 minus 3E1.1, 3B1.2, Allen's guideline would have sat finally at a criminal history three, base offense 36, producing a 235 (low end) to 293 (high end). Based upon this calculus and no increase, this serves as the proper sentencing methology. Viewing the error as an error in sentencing, the prejudice is clear. United States v. Martinez-Rios, 143 F.3d 662, 671-76 (2d Cir. 1998) (Holding that arithemetical error that resulted in an increase to defendant's offense level pursuant to guideline affected his sentence.) As will be explained infra, no mandate nor issue, as outlined supra, was waived.

### NO MANDATE WAS ISSUED, ALLEN'S ISSUE WAS NOT WAIVED OR THE IMPLICATIONS OF AN ISSUE  NOT WAIVED

An issue is not waived, however, if a party did not at the time of the purported waiver, have both an opportunity and an incentive to raise it before the sentencing court or on appeal. See United States v. Ticchiarelli, 171 F.3d 24, 32033 (1st Cir. 2002) ("Whether there is a waiver depends not... on counting the number of missed opportunites... to raise an issue, but on whether the party had sufficient incentive to raise the issue in the prior proceedings.") (citation omitted) cert. denied subnom Bowen v. US, 528 US 850 (1999). See also United States v. Whren, 324 US App. D.C., 111 F.3d 956, 960 (D.C. Cir. 1997) ("A defendant should not be held to have waived an issue if he did not have a

reasón to raise it at his original sentencing...") cert. denied, 522 US 1119
(1998). Allen's reliance on counsel, not the everyday common layman to the com-
plexities of Rule 32 (FRCP). Thus, if a sentencing determination had no practi-
cal effect on Allen's sentence at the original sentencing but becomes relevant
only after appellate review. Allen is free to challenge that determination ini-
tially as outlined supra. On remand and ultimately on reappeal, despite the
failure to challenge that determination initially. Contigent upon relief, suc-
cessful remand, re-opening of Hebeas proceedings would leave Allen free to chal-
lenge the Rule 32, sentencing determinations. See Whren, Id. at 960 (Holding
that the district court may consider issues "made newly relevant by the court
of appeals decision whether by reasoning or by the result.") Ticchiarelli, 171
F.3d at 32 (Same citing Whren) see also Atechortva, 69 F.3d at 685 (noting that
a failure to make an argument at the original sentencing cannot be viewed as a
waiver if that argument would have then been "purely academic.") To deprive
Allen of this ability would necessarily increase the burden on the district
court and appeals court because ALlen would be forced to litigate every aspect
of the sentencing report in the original hearing. Even irrelevant to the imme-
diate sentencing, determination in anticipation of the possibility that upon
remand, the issue might be relevant. See Stepp v. United States, 519 US 975
(1996). Furthermore and importantly, relief or even when a remand is limited,
an issue may be raised if it arises as a result of events that occur after the
original sentence. See United States v. Bryson. 229 F.3d 425, 426 (2d Cir. 2000)
(per curiam) (Holding that even when the remanding opinion ordered resentences
at a specific offnse level, the district court could depart from this level if
it were "intervening circumstances.") See also Weber v. United States, 149 F.3d
172, 178 (2d Cir. 1998) (Holding that the district court at resentencing must
take into account changed circumstances.) The circumstances detailed herein
and attached are left to the court's interpretation concerning Allen's claim(s)

set forth. This to some extent, reflects the general admonition that a "courts duty is always to sentence a defendant as he stands before the court on the day of sentencing." Barring the forthcoming issues, Allen stood originally sentenced before the court. Allen seeks not challenges to the conviction and the underlying acts treated as seperate counts of conviction. They are inextricably tied to the count of conviction. Allen seeks not the undoing of the intricate knot of the convictions. See United States v. Morales, 185 F.3d 74, 85 (2d Cir. 1999). In contrast relief, a resentencing to correct specific sentencing errors does not ordinarily undo the entire "knot of calculation." Allen seeks remedy/relief to the stated herein.

### THE LAW OF CASE DOCTRINE PERMITS RELIEF

The law of the case doctrine has two branches: (1) requires a trial court to follow an appellate court's previous ruling on an issue in the same cases. United States v. Uccio, 940 F.2d 753, 757 (2d Cir. 1991), citing United States v. Cirami, 563 F.3d 26, 32 (2d Cir. 1977). Per se the "mandate rule." See United States v. Tenzer, 213 F.3d 34, 39-40 (2d Cir. 2000); and (2) the more flexible branch is implicated when a court considers its own ruling on an issue in the absence of an intervening ruling on the issue by a higher court. It holds "that when a court has ruled on an issue, that decision should generally be adhered by that court in subsequent stages in the same case." Uccio, 940 F.2d at 758. Unless "cogent and compelling" reasons militate otherwise. Tenzer, 213 F.3d at 39. The "mandate rule" ordinarily forecloses relitigation of all issues previously waived by a defendant or decided by the appellate court. But, upon a successful remand on relief, Allen may raise in district court issues not previously raised that were not ruled upon. See United States v. Stanley, 54 F.3d 103, 107 (2d Cir.) ("Stanley II") cert. denied, 516 US 891 (1995). Allen seeks to raise issue(s) that he did not waive by not raising them during his initial sentencing proceedings or on his previous appeal. The total offense level, im-

properly enhanced, causing Allen to languish in prison longer than necessary
present a "cogent and compelling" reasons in itself with all detailed supra
permitting Allen to do so. Citing Hicks v. US, 137 S.Ct. 2000, 2001 (2017)
(Justice Gorsuch concurring ("For who wouldn't hold rightly a diminished view
of our courts if we allowed individuals to linger longer in prison than the
law requires only because we were unwilling to correct our own mistakes.")
Even if an issue is barred by the law of the case, appellate courts may depart
from the law of the case and reconsider the issue for "cogent and compelling"
reasons. Such as intervening change of controlling law, availability of new
evidence, or the need to correct  a clear error or prevent manifest injustice.
See United States v. Tenzer, 213 F.3d 34, 39 (2d Cir. 2000) (citation and in-
ternal quotation omitted) Accord United States v. Minicone, 994 F.2d 86, 89
(2d Cir. 1993); and despite the second branch of the law of the case doctrine,
as stated supra, district courts may similarly depart from the law of the case
and reconsider their own decisions for "cogent and compelling" reasons. If those
decisions have not been ruled on by the appellate court. See DiLaura v. Power
Auth., 982 F.2d 73, 77 (2d Cir. 1992) Citing Doe v. N.Y. City of Dept of Social
Svcs., 709 F.2d 762, 789 (2d Cir.) cert. denied subnom Catholic Home Bureau v.
Doe, 464 US 864 (1993), see Minicone, 994 F.2d at 89. ("The trial court is bar-
ed from reconsidering or modifying any of its prior decision ruled upon by high-
er courts.") Allen's issue has not and the equity of law demands fair and just
relief to correct this issue set forth. To the extent that this court is held,
bound by  the previous ruling of the Court of Appeals issued presented that
were not ruled upon nor waived as stated supra. "Cogent and compelling reasons
warrants the court review. In the alternative that this court believes that
Allen is making a claim, which is better suited in a second and successive
motion, per 28 USC 2255, Allen asks that the court forward the motion to the
Court of Appeals for review. Courts are required to transfer such a motion to

-10-

the court, if doing, is in the interest of justice. 2244(b)(3). See <u>Liriano v.</u>
<u>United States</u>, 95 F.3d 119, 123 (2d Cir. 1996), see also <u>Brown v. Ercole</u>, 2012
US Dist. Lexis 177523 (S.D.N.Y. Dec. 12, 2012) "A motion under Rule 60(b) may
be treated as a second or successive hebeas petition if necessary to enforce
the requirements of the AEDPA [Anti-Terrorism and Effective Death Penalty of
1996]" <u>Tyler v. Anderson</u>, 135 S.Ct. 370, 190 L.Ed. 2d 264 (2014) (citing <u>Gon-</u>
<u>zalez</u>, 545 US at 531-32)

CONCLUSION

Where Allen prays the court grants relief per Rule 60(b) or transfer
for second successive petition if deemed appropriate.

Respectfully submitted,

Dated 9/11/19

Russell Allen
Russell Allen

-11-

Exibit A

§3D1.4

an exceptionally large property loss in the course of the rape would provide grounds for an upward departure. *See* §5K2.5 (Property Damage or Loss).

**Background:** This section provides rules for determining the offense level associated with each Group of Closely Related Counts. Summary examples of the application of these rules are provided at the end of the Commentary to this Part.

| Historical Note | Effective November 1, 1987. Amended effective November 1, 1989 (amendments 257 and 303); November 1, 2001 (amendment 617); November 1, 2004 (amendment 674). |
|---|---|

## §3D1.4.   Determining the Combined Offense Level

The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

| NUMBER OF UNITS | INCREASE IN OFFENSE LEVEL |
|---|---|
| 1 | none |
| 1 1/2 | add 1 level |
| 2 | add 2 levels |
| 2 1/2 – 3 | add 3 levels |
| 3 1/2 – 5 | add 4 levels |
| More than 5 | add 5 levels. |

In determining the number of Units for purposes of this section:

(a)   Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

(b)   Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level.

(c)   Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level. Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.

### Commentary

**Application Notes:**

1.   Application of the rules in §§3D1.2 and 3D1.3 may produce a single Group of Closely Related Counts. In such cases, the combined offense level is the level corresponding to the Group determined in accordance with §3D1.3.

## BRIAN K. ROBINSON, P.C.

Attorney at Law
1825 Park Avenue, Suite 1102
New York, New York 10035
office: (212) 722-4900 ext. 311
fax:  (212) 722-4966

*Exibit B*
*Proff of Extraordernay*
*Circumstances*

October 24, 2008

**By First Class Mail**

Mr. Russell Allen
MDC Brooklyn
P.O. Box 329002
Brooklyn, New York 11232

**Re:     Libel Suit Against Don Diva Magazine**

Dear Mr. Allen:

Enclosed please find a copy of the Amended Summons With Notice, dated July 22, 2008. This document was filed with the New York County Clerk on July 23, 2008 (a copy of the Clerk's stamp is provided as proof of this filing).  The initial filing occurred on July 3, 2008 (a copy of the filing receipt is provided for your records).  The document was amended to include Don Diva Entertainment as a defendant in the action.  The nature of the suit is for libel, and the judgment amount sought is $1,000,000.00.

I will keep you posted as the matter progresses.

Thank you in advance for your cooperation.

Yours truly,

Brian K. Robinson, Esq.

**BRIAN K. ROBINSON, P.C.**
Attorney at Law
1825 Park Avenue, Suite 1102
New York, New York 10035
office: (212) 722-4900 ext. 311
fax: (212) 722-4966

February 4, 2009

**_By First Class Mail_**

Mr. Russell Allen #74365-053
MDC Brooklyn
P.O. Box 329002
Brooklyn, New York 11232

Re:    <u>**Libel Suit Against Don Diva Magazine**</u>

Dear Mr. Allen:

Enclosed, please find my retainer letter which advises you of the services and fees associated with my counsel. Upon review and agreement of the retainer letter, sign and return the document to me as quickly as possible.

The next issue of Don Diva will contain a retraction of the story written about you. I am also in discussions with Don Diva's attorney regarding a settlement amount. I will send you an update by the end of the month.

Thank you in advance for your cooperation.

Yours truly,

Brian K. Robinson, Esq.

Enc.

already. I've done everything I wanted to do." But the judge threw out the death penalty frustrating the prosecutors on the case. "There's no chance in the world there would be a death penalty verdict in this case," stated the trial judge, US District Court Judge, Frederic Block. Even with the death penalty being dropped is still didn't look too good for preme, Emanual "Dog" Mosley testified that during the summer of 2001, Supreme approached him about the murder contracts. According to this informant, Supreme wanted to kill Singleton for "fucking" with Murder Inc, and because he fucked with E-Money Bags. The E-Money Bags contract was just a plain and simple retribution killing for the murder of Supreme's man Black Just.

---

### What do you think of the state of the game today? What is your take on snitches today?

The game has been over for a long time. It's in a sad state of affairs. It is now designed so that the only one who can flourish is the rat. As long as he is willing to sleep with the government he can operate with out penalty. Who could you possibly trust? Once the government involves itself in local affairs that is an ominous sign. The feds always create monster's they can no longer control. These snitches are no different- it will come back to haunt them.

Treason is the highest crime in any land, punishable by death. Treason is the betrayal of one's trust or assisting the other side. Now this treachery is frowned upon and unacceptable in every segment of life, but its promoted in the black community- why not in the white community where drugs are just as prevalent? Through out history when every member of society becomes an agent of the government chaos ensues. It's neighbor against neighbor, brother against brother. People are using this to settle old scores. A rat is the lowest life form known to man- they serve no purpose on this planet. They spread disease and misery wherever they are allowed to exist. Who will allow them to infest their environment? Who could possibly feel comfortable in their presence? A man who can not accept culpability for his own actions is not a man.

"There is a profound difference between a witness who has no vested interest in a criminal activity and a snitch who benefits greatly," Supreme says. And unbeknownst to Supreme, Emanual Dog Mosley was a 5K1 frequent flyer. A 5K1 is a federal sentencing guideline policy says that if a person provides "substantial assistance" to the government regarding the crime of another person they are eligible to receive a reduced sentence for their crimes. It came out in trial that Mosley had snitched in a mid 90's Pennsylvania drug conspiracy when he was facing 20 years. As the prosecutor laid out the numerous murder and drug conspiracy counts and drug operations in New York and Baltimore- more dudes from Mosley's hit squad like Barry "Mungo" Broughton, Alvin Smiley, Eric "EBay" Moore and Russell Allen testified against Supreme. The video tape Nicole Brown made of E-Money Bags 20 minutes before he died was played for the jury. Michael Todd Harvey told the jury how he was involved selling large amounts of cocaine and heroin to Supreme in mid-90's and John "Love" Ragin, Supreme's supposed partner told many things, among them how Supreme allegedly told him that the E-Money Bag's murder was like the Fourth of July. The prosacutor Carolyn Pokorney related how "McGriff's fingerprints were lift-

ed from the drug stashhouse where the Baltimore detectives found the video tape of E-Money Bags tape. His fingerprints were allegedly all over the stash house, and not only the stash house but in the exact bag where the detectives found this tape.

### How did snitches play a role in this last trial?

Supreme: My entire trial existed on them. They gave out 11 deals to convict 1 person. 6 of these snitches testified at my trial. I had only actually met two of them- Emanuel "Manny Dog" Mosley and Jon Ragin; [then there was] Climente "CJ" Jordan, Barry Trip, Mongo Broughton, Alvin Smiley, Michael Hardy, Terrance "Tony" Terrell, Eddie "Divine Knowledge" Oliver, Juan Romano and Phillip "Dalu" Banks. Climente "CJ" Jordan was the catalyst. He was doing 15 years in Delaware and he decided to cut his sentence at my expense. I had never met him and don't knock him. He told on Manny Dog and his crew. Manny Dog already had a 5K1 (Substantial Assistance) in 1991 in Pennsylvania- and went in for his second time at bat. Now remember in my trial the government said the guys who got killed were trying to kill me and killed my man. But all the rat's had numerous murders, drug dealing and horrendous crimes. They will all be released in 5 to 10 years- just so the government could get a conviction on me. These guys testified under oath that they would lie, have lied and would do what was necessary to receive a deal. They testified that they killed, robbed, sold drugs- and all was forgiven because they now stood with the prosecution and now we are supposed to believe that we can trust them. Would you trust a pit bull who had revealed its true nature, just because it was being held by a beautiful woman and appeared friendly? My attorney asked the jury in closing, if they encountered one of these incorrigible individuals in public would you trust them? Would you buy a car from them? Would you buy a house from them? Then how could you trust them enough to take a man's life? You can't change their nature. The government is willing to tolerate any type of [distasteful] behavior when it serves their interest.

Prosecutors went overboard portraying Supreme as this super evil gangster who couldn't possibly have been involved in any legitimate business ventures. The government's portrayal of Supreme was almost cartoonish. In McGriff's defense attorney, Runke argued, "What we don't have on these murders is wiretaps, we don't have anybody discussing murder over a wiretap, we don't have finger prints that matter. NO FINGERPRINTS THAT MATTER. NO fingerprints associated with the murders at all. Fingerprints or something related to the crime. No eyewitnesses, somebody who explains they were on the street corner and they saw McGriff and Mosley. They don't have any DNA, firearm matches, nothing compares to anything. No matches, no ballistics, nothing." But it didn't matter. What they did have was the testimony of criminals and McGriff's criminal history. Once a criminal always a criminal- except of course, if you're a government informant- then the rules don't apply.

### When you were initially released from prison and you began to work on your films did you ever think that the Feds would make you a target again? Do you think that you would have been better off just staying out the way?"

Supreme: Should i have not taken a legal opportunity out of concern of the feds? What aggravated the feds was that I actually made a film based on a Donald Goines book, with an all star cast

**BRIAN K. ROBINSON, P.C.**
Attorney at Law
1825 Park Avenue, Suite 1102
New York, New York 10035
office: (212) 722-4900 ext. 311
fax: (212) 722-4966

February 26, 2009

**_By First Class Mail_**

Mr. Russell Allen
MDC Brooklyn
P.O. Box 329002
Brooklyn, New York 11232

Re:    **Libel Suit Against Don Diva Magazine**

Dear Mr. Allen:

Below please find the official printed retraction of the article in Issue #30 mentioning your alleged testimony against Kenneth McGriff. It appears in Issue # 36, Year 2009 of DON DIVA Magazine, which is currently on newsstands.

I will keep you posted as the matter progresses further.

Yours truly,

Brian K. Robinson, Esq.

## RETRACTION

IN DONDIVA MAGAZINE ISSUE #30 entitled, "THE GOOD THE BAD THE UGLY", in the article "the BAD", the Kenneth "Supreme" McGriff story, it was mistakenly reported that Dennis Crosby, Russel Allen, and Eric "E-bay" Moore testified against Kenneth "Supreme" McGriff, when in fact Kenneth McGriff has since clarified that this is not true. Dennis Crosby, Russell Allen and Eric "E-Bay" Moore DID NOT testify against Kenneth "Supreme" McGriff. This interview was conducted under very unusual circumstances as the author of story was incarcerated with McGriff before his trial. McGriff was then moved during the story process to a high security facility with limited communication. Don Diva apologies to Dennis Crosby, Russell Allen and Eric Moore's families for the misrepresentation. Don Diva at all times strives to maintain integrity in our reporting and always strive to report the truth.



**U. S. Department of Justice**

Federal Bureau of Prisons

SERO

---

*3800 Camp Creek Pkwy SW*
*Bldg 2000*
*Atlanta, GA 30331*

March 29, 2011

Russell Allen
Reg. No. 74365-053
FCI Talladega
Box 1000
Talladega, AL 35160

Re: Freedom of Information Request No. 11-05104

Dear inmate Allen:

This is in response to your request for records which are maintained by the Bureau of Prisons.  Specifically, you are requesting information regarding the time you have spent in the Special Housing Unit.

The Attorney General has exempted the Bureau of Prisons from certain provisions of the Privacy Act of 1974. Title 5 U.S.C. Section 552a(j). Therefore, all material granted, excised from documents, or denied herein has been processed under the authority of an alternative means of access, which is part of said exemption. The exemption, including the alternative means of access, is set forth in Title 28 Code of Federal Regulations, Section 16.97. Accordingly, your access rights are limited to those provided by the non-exempted portions of the Privacy Act of 1974 and the Freedom of Information Act, Title 5 U.S.C. Section 552 and as implemented by Title 28 Code of Federal Regulations, Part 16, Subpart A and D. The procedures established for use by the Bureau of Prisons are outlined in Program Statement 1351.5, Release of Information, and Program Statement 5800.11, Inmate Central File, Privacy Folder and Parole Commission File.

We are enclosing the Sentry quarter assignment which indicates the day you were placed in SHU and the day you were released back into the unit.

Pursuant to Title 28 Code of Federal Regulations, Section 16.9 or 16.45, the material herewith may be appealed by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C. 20530.  Your appeal must be received by OIP within 60 days of the date of this letter.  Both the appeal letter and face of the envelope should be marked "Freedom of Information Act Appeal."

Sincerely,

Jeff Campbell
SERO Attorney

```
  SERAE  531.01 *                 INMATE HISTORY            *      03-17-2011
PAGE 001          *                  QUARTERS               *      09:05:29

  REG NO..: 74365-053 NAME....: ALLEN, RUSSELL
  CATEGORY: QTR          FUNCTION: PRT          FORMAT:

FCL   ASSIGNMENT DESCRIPTION                      START DATE/TIME STOP  DATE/TIME
TDG   D06-004L   HOUSE D/RANGE 06/BED 004L        12-02-2010 1242 CURRENT
TDG   R01-001L   HOUSE R/RANGE 01/BED 001L        12-02-2010 0958 12-02-2010 1242
OKL   C01-303U   HOUSE C/RANGE 01/BED 303U        11-08-2010 1945 11-18-2010 0725
BRO   K04-825L   HOUSE K/RANGE 04/BED 825L        07-06-2010 1756 11-08-2010 0835
BRO   K03-803U   HOUSE K/RANGE 03/BED 803U        07-06-2010 1210 07-06-2010 1756
BRO   G04-404U   HOUSE G/RANGE 04/BED 404U        06-28-2010 1347 07-06-2010 1210
BRO   G02-416L   HOUSE G/RANGE 02/BED 416L        06-25-2010 1908 06-28-2010 1347
BRO   R02-001L   HOUSE R/RANGE 02/BED 001L        06-25-2010 1541 06-25-2010 1908
BRO   R02-001L   HOUSE R/RANGE 02/BED 001L        03-25-2010 0231 03-25-2010 0420
BRO   K03-824L   HOUSE K/RANGE 03/BED 824L        03-10-2010 1115 03-25-2010 0231
BRO   K03-824U   HOUSE K/RANGE 03/BED 824U        01-26-2010 1456 03-10-2010 1115
BRO   K04-824U   HOUSE K/RANGE 04/BED 824U        01-25-2010 1728 01-26-2010 1456
BRO   K03-802U   HOUSE K/RANGE 03/BED 802U        01-14-2010 1853 01-25-2010 1728
BRO   Z05-920LAD HOUSE Z/RANGE 05/BED 920L AD     01-04-2010 0913 01-14-2010 1853
BRO   G04-423L   HOUSE G/RANGE 04/BED 423L        12-14-2009 1428 01-04-2010 0913
BRO   Z06-917LDS HOUSE Z/RANGE 06/BED 917L DS     12-10-2009 1158 12-14-2009 1428
BRO   Z06-904LDS HOUSE Z/RANGE 06/BED 904L DS     11-19-2009 1518 12-10-2009 1158
BRO   Z05-904LAD HOUSE Z/RANGE 05/BED 904L AD     11-11-2009 1438 11-19-2009 1518
BRO   Z05-903LAD HOUSE Z/RANGE 05/BED 903L AD     11-10-2009 1608 11-11-2009 1438
BRO   J05-717L   HOUSE J/RANGE 05/BED 717L        11-06-2009 1008 11-10-2009 1608
BRO   J05-716L   HOUSE J/RANGE 05/BED 716L        10-05-2009 1025 11-06-2009 1008
BRO   J06-722L   HOUSE J/RANGE 06/BED 722L        09-30-2009 1515 10-05-2009 1025
BRO   K07-803L   HOUSE K/RANGE 07/BED 803L        09-03-2009 0643 09-30-2009 1515
BRO   G06-405U   HOUSE G/RANGE 06/BED 405U        08-06-2009 1533 09-03-2009 0643
BRO   Z07-913UAD HOUSE Z/RANGE 07/BED 913U AD     07-20-2009 0705 08-06-2009 1533
BRO   I03-621L   HOUSE I/RANGE 03/BED 621L        06-18-2009 1408 07-20-2009 0705
BRO   I03-621U   HOUSE I/RANGE 03/BED 621U        01-26-2009 1230 06-18-2009 1408
BRO   I03-626L   HOUSE I/RANGE 03/BED 626L        12-21-2008 0853 01-26-2009 1230
BRO   I01-607U   HOUSE I/RANGE 01/BED 607U        12-21-2008 0843 12-21-2008 0853
BRO   I03-626L   HOUSE I/RANGE 03/BED 626L        12-19-2008 1418 12-21-2008 0843
BRO   I02-628U   HOUSE I/RANGE 02/BED 628U        12-19-2008 1059 12-19-2008 1418
BRO   Z08-917LDS HOUSE Z/RANGE 08/BED 917L DS     12-17-2008 1220 12-19-2008 1059
BRO   Z07-917LAD HOUSE Z/RANGE 07/BED 917L AD     12-08-2008 1218 12-17-2008 1220
BRO   Z01-005LAD HOUSE Z/RANGE 01/BED 005L AD     11-19-2008 1103 12-08-2008 1218
BRO   Z01-013LAD HOUSE Z/RANGE 01/BED 013L AD     10-30-2008 1452 11-19-2008 1103
BRO   Z01-018LAD HOUSE Z/RANGE 01/BED 018L AD     10-29-2008 2050 10-30-2008 1452
BRO   Z01-001LAD HOUSE Z/RANGE 01/BED 001L AD     10-29-2008 2045 10-29-2008 2050
BRO   I01-629L   HOUSE I/RANGE 01/BED 629L        08-28-2008 1151 10-29-2008 2045
BRO   I01-615U   HOUSE I/RANGE 01/BED 615U        07-18-2008 0949 08-28-2008 1151
BRO   I02-602L   HOUSE I/RANGE 02/BED 602L        07-17-2008 1510 07-18-2008 0949
BRO   Z05-912UAD HOUSE Z/RANGE 05/BED 912U AD     07-15-2008 1529 07-17-2008 1510
```

G0002       MORE PAGES TO FOLLOW . . .

```
  SERAE  531.01 *              INMATE HISTORY           *       03-17-2011
PAGE 002 OF 002 *               QUARTERS               *       09:05:29

REG NO..: 74365-053 NAME....: ALLEN, RUSSELL
CATEGORY: QTR        FUNCTION: PRT        FORMAT:

FCL     ASSIGNMENT  DESCRIPTION               START DATE/TIME STOP  DATE/TIME
BRO     G02-404U    HOUSE G/RANGE 02/BED 404U  07-11-2008 2316 07-15-2008 1529
BRO     R02-001L    HOUSE R/RANGE 02/BED 001L  07-11-2008 2002 07-11-2008 2316
BRO     R02-001L    HOUSE R/RANGE 02/BED 001L  12-27-2006 0440 12-27-2006 0750
BRO     J04-704L    HOUSE J/RANGE 04/BED 704L  10-27-2006 1108 12-27-2006 0440
BRO     S03-001L    HOUSE S/RANGE 03/BED 001L  10-25-2006 1221 10-27-2006 1108
BRO     J04-706U    HOUSE J/RANGE 04/BED 706U  09-20-2006 0804 10-25-2006 1221
BRO     C01-004U    HOUSE C/RANGE 01/BED 004U  09-13-2006 0733 09-20-2006 0804
BRO     C04-004U    HOUSE C/RANGE 04/BED 004U  08-04-2006 1854 09-13-2006 0733
BRO     G01-405L    HOUSE G/RANGE 01/BED 405L  08-02-2006 2141 08-04-2006 1854
BRO     R02-001L    HOUSE R/RANGE 02/BED 001L  08-02-2006 1730 08-02-2006 2141
```

```
G0000        TRANSACTION SUCCESSFULLY COMPLETED
```



Russell Allen 71125-053
F.C.I. Florence ADMAX
Florence, CO 81226

United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn New York 11201

USMS

RECEIVED
SEP 17 2019
PRO SE OFFICE

LEGAL
MAIL